Council, now there's 20 minutes aside in this first series of cases. How are you planning on dividing your time, or are you? Yes, we are, Your Honor. My name is Terry Mundorf and I'm here on behalf of the Western Public Agencies Group, the Northwest Requirements Utilities, and the Public Power Council. I intend to take about eight minutes or so to address the legality of the contract. My colleague, Mr. Goldfarb, who represents the Snohomish Public Utility District, intends to take a few moments to address some of the arguments that Bonneville made, and we wish to reserve about four minutes to respond to the arguments that Bonneville may make in response. So that was our plan. All right. And you'll keep track of your own time, and I'll try to remind you. I will try to do so, and hopefully I'll have some success with that. Your Honors, before I start into the merits of the argument, I'd like to take a step back and describe briefly for you what I consider to be the common thread or link between this case, which looks at the contract, settlement contracts that Bonneville signed, the cases that you'll hear later this morning, which focus on amendments to those contracts, and the case that you'll hear on Wednesday, which challenges the implementation in Bonneville's rate case of the 7B2 rate ceiling. These cases are related because they all stem from a common decision that Bonneville made. Granted, they were based on separate decisions and separate petitions, but Bonneville, in its 1998 subscription strategy, made a decision to implement a new benefit payment program to the investor-owned utilities. Bonneville took this action because it felt that the payments being made to those utilities and the calculation of those benefits under Section 5C of the Act was unsatisfactory and that the amount of benefits being paid to those utilities was too small, given the limitations imposed on it by Sections 5C, 7B2, and 7B3. This may be a question better directed to Bonneville, but I might get an answer that would be useful out of you as well. One of the things I couldn't quite understand was why Bonneville was so anxious to provide more money for the IOUs. That probably is a question better directed to Bonneville, but I will offer my judgment on that because I was involved in the discussions during that process. And it's my belief that Bonneville felt that because of the regional review and the governor's recommendations that it received, and just general pressure it was receiving from the state public utility commissions, that it was necessary for it to revisit the level of benefits that it was providing. Okay. So getting back to the overview part of this, Your Honors, Bonneville made a conscious decision to increase the benefits paid. And it thought it could do that and essentially rise above these statutory limitations by invoking its settlement authority. Bonneville thought that when it invoked its settlement authority, it could sign contracts that contained provisions that were contrary to specific statutory provisions, even provisions that were designed to benefit non-settling parties. So the common thread in these cases is that each one involves an instance where Bonneville took an action, whether it be in contract or in a rate setting, to implement its new policy, and it did so, when it did so, it overrode specific statutory provisions. Different provisions in each case, same basic decision, same basic result. In this particular case, Your Honors, we are looking at Bonneville's execution of a contract, which we believe obligates Bonneville to take actions which it cannot do consistent with its statutory duties. These contracts obligate Bonneville to calculate the investor and utility benefits in a manner that is completely untethered to the formula contained in Section 5C of the Power Act. It also requires Bonneville to pay benefits that exceed the limits established in that statute. By signing this contract, Bonneville has failed to follow the express intent of Congress. It has substituted its judgment for that of Congress in terms of what the IOU should be receiving in terms of benefits, and it has deprived ultimately public utility customers of the cost protection Congress expressly intended them to receive by virtue of Sections 7B, 2, and 3 of the Regional Act. In the statute, Section 5C authorized Bonneville to make payments to the investor and utilities, but that section also specified that the payments were to be calculated based on the difference between the utility's average cost of resources and the Bonneville power rate. What this scheme meant is that when Bonneville's power rate increased, the difference between those two decreased, and hence the benefits received by the investor and utilities were diminished. The Power Act also required Bonneville to limit the cost that it charged public utilities for the cost of the IOU benefit program. When the 7B, 2 limit was reached, Congress specified that BPA is required, pursuant to Section 7B, 3, to reallocate those costs to all other customer rates, and that included the rate used to calculate the benefits for the IOUs. The clear purpose of these statutory provisions was to make the surcharge applicable to the rate used to calculate the benefits for the IOUs and to make those benefits subject to diminution when that surcharge was applied. These statutory provisions, I believe, state a clear and express intent of Congress. Congress directed Bonneville to give priority to providing the public agencies cost protection, even if it came at the cost of reducing the benefits made available to the investor and utilities. The contracts that Bonneville signed disrupted this statutory scheme. In particular, Section 4A of the contract essentially abandons the calculation scheme set up in Section 5C. If we agree with your position and we hold that Bonneville is not entitled, as part of its settlement authority under Section 2F, to enter into these settlement agreements that would override the otherwise applicable limits contained in 7B, 2 and maybe elsewhere, what happens? I believe, in that case, the contracts would be set aside because they would be void ab initio. The matter would be remanded to Bonneville. As I will explain later in my argument, I believe Bonneville entered into these contracts as a mistake of law, as did the investor-owned utilities. I think under those circumstances, the investor-owned utilities would be justified in being able to sign either a new settlement that comports with the law or a new residential exchange program contract covering the period that they would have otherwise had one in place had they not made the mistaken law. But we're headed for some new proceeding to reset those rates. I believe so. Well, it's not to reset the rates, Your Honor. It's actually to require the contract that they sign to comport with the law. The ultimate result is rates get set, but this is not in itself a rate-setting matter. It's a matter of whether these contracts conform with the law. But at some point, the amounts of money paid under the voided contracts would have to be compared with the money they were entitled to under a proper residential exchange contract. So at some point, the IOUs are going to have to put, if you're right, they're going to have to pay some money back to Bonneville. I believe that would ultimately be. And their ratepayers are going to have to pay a little more money. Maybe a little. No, I'm not sure that's the case. So I think you were right as to the first point. I'm not sure I would agree as to the second. You mean the IOUs are going to get their money back where else from the ratepayers? The matter of where, who ultimately pays the money back, I think, is a regulatory matter to be taken up by the State regulatory authorities. And I think it is the case that they will have the choice of either requiring the ratepayers to do it or requiring the shareholders to do it. This is a common choice. So it's not necessarily coming out of the eyes of the ratepayer, would be my answer. I see. I understand. Thank you. So, two points. I just took you to the eight-minute period. Sorry? I just took you to your eight minutes. I realize that, but I'm going to impose on my counsel to complete this part and make two more points, and then I'm going to try to get out of his way. What I was trying to point out to Your Honors first was Section 4 of the contract essentially abandons the statutory calculation for investor-owned utility benefits. And Section 4C of the contract, which we're challenged here today, actually disables the operation of Section 7B3, which is the mechanism Congress intended to use and required Bonneville to use to reallocate costs that have to be removed from rates of public customers. The result of these two provisions is they exactly reverse the congressional priorities, exactly reverse them. Bonneville has sacrificed the rate protection Bonneville provided to the public utilities in Sections 7B2 and 3 in order to increase the benefits available to the investor-owned utilities. They've just done it backwards. Two other points I'd like to make, and then I'll sit down. One is that in this case we seek redress of a harm that's already occurred. The violation of statute has already occurred. Before Bonneville signed these contracts, it had already determined that the benefits it was permitted to pay the IOUs under Sections 7B2 and 3 was limited to $48 million annually. It had also determined that the benefits it was going to be obliged to pay by signing the contracts and the foray of the contracts would exceed $140 million annually. So they knew going in that the contract would take them beyond the statutory limit. Bonneville signed the contracts anyway, and I believe they signed those contracts based on a mistake of law. They believe that when they exercise their settlement agreement, they may do so with disregard to other limitations in the statute, and they may override those provisions even when those provisions are designed to benefit parties who are not signatories to the settlement. We think in this regard Bonneville made a mistake of law. My last point has to do with the type of case this presents to Your Honors. We believe this is a case of statutory interpretation rather than one of judging Bonneville's discretion or any other type of case. In this matter, we are asking the Court to decide whether or not the contracts comported with the statute. We think this case should be decided on the first prong of the Chevron test. To each of the issues that we have brought before the Court, Congress has spoken clearly and in detail there is no equivocation, there is no gap, there is no silence. Congress told Bonneville what to do. They told them how to conduct their business in Section 5C with clarity, in Section 7B2, and in Section 7B3. There is no choice in this matter. Bonneville was required to implement that will of Congress. By signing the contracts, they simply failed to do so, and we believe for that reason these contracts must be set aside. I'd like to turn the podium over to my colleague, Mr. Goldfarb. Good morning. May it please the Court, my name is Mike Goldfarb. I'm an attorney for Public Utility District No. 1 in Snohomish County. I'm going to be very short so we can save a little time for rebuttal. There is a threshold housekeeping issue that I wanted to bring to the Court's attention, which is that the six contracts which are the basis of this appeal were not included in Bonneville's original administrative record. We moved to supplement the six, and the Court, in denying our motion to supplement, which included a number of other matters, also swept those up. I suspect that was not the Court's intention, because I think those are important to have in the record as a basis for the entire appeal. We filed a very short motion to clarify or reconsider on that narrow issue just to make sure, but I wanted to bring to the Court's attention the fact that technically right now the six contracts that we're appealing from are not before the Court and would hope that the Court would include them in the ultimate disposition. I wanted to address the specific issue of Bonneville's settlement authority. Can I ask you one question that may be a threshold question? In its brief, Bonneville contends that the arguments now being made were not made in the administrative proceeding and that we should therefore not allow them in front of us at this point. What's your response to that? That the rule is that regardless of the party that brings the issue to the attention of the administrative agency, the key question is was it before the agency. And if you read the underlying record of decision, you'll see 40 or 50 pages of the record of decision that are devoted to the specific issues that are under appeal here. Beyond that, my client, Snohomish, as a part of a trade group, submitted comments as did many others. And in our reply brief submitted in this case, we listed, I think, 12 or 15 different examples over time that had been filed with the agency, the placing agency. And if Bonneville contends that nobody raised it, I guess they can contend that and you can respond. Okay. Bonneville's position with regard to its settlement authority in this case is a slippery slope. If Bonneville can, in this case, exercise what amounts to plenary settlement authority to do what Congress explicitly said it cannot do, what is left of the Northwest Power Act? And that's really the point that I wanted to make here. From a policy standpoint, I mean, the Court's aware of what the cases say. Bonneville has broad settlement discretion. I want to ask, do you consider this an unusual clause that allows the administrator to enter into contracts and to make settlement agreements? Is this significantly different from what you find in ordinary contracts or in ordinary statutes regulating government agencies? I think Bonneville's statutory authority to settle is broader, I think, than some other agencies. However, the cases that have construed Bonneville's authority to settle and also its authority to enter contracts, because really the scope of that authority is the same. Settlements are just a species of contract. The courts have universally held that Bonneville's authority to enter into contracts or settlements stops at the point where Congress has issued a clear directive of its intent. So really the analysis here is basic Chevron analysis. The first step is to look and see exactly what it is that Congress said. What Congress said in this case is that there are rate protections under 7b-2 and there's a specific mechanism under 7b-3 to surcharge all other rates once the rate ceiling is reached. The settlements that Bonneville has entered into in this case specifically disable that surcharge mechanism and were entered into with the full knowledge that the rate test had triggered at $48 million and they said, we can't pay residential exchange benefits in that amount, we know that, but we'll stamp settlement on it and by calling it a settlement, same money, same beneficiaries, but by calling it a settlement we have the authority to do it. Counsel, you don't dispute then that Bonneville had the power to enter into settlements with the IOUs. Your dispute is that the settlement that they entered into didn't bear any relationship to the rate structure that was provided for in the Act. I think it's a scope of authority issue. They certainly have the general authority to enter into settlements. The question is how far can they go. So, for example, if the statute said you can pay a maximum of $10 and they settled and they paid $20, our position would be that they've gone beyond a direct mandate of Congress. If they paid $8, maybe it's a different case. But in this particular case, Congress said there's a rate protection for the public utilities and there's a specific mechanism in 7B3 that surcharges all other rates when you reach that cap. And what they did, if you read Section 4C of the contract, is they said no matter what happens, the IOUs get the lowest possible rate. So they disabled that surcharge mechanism. I'd like to reserve that remaining three minutes, if I may. Thank you. May it please the Court. Good morning. My name is Kurt Cassad, representing respondent, Bonneville Power Administration. First of all, I'd like to note that the benefits we're talking about go to the residential and small farm consumers of the industrial utilities, not to the utilities themselves. Utilities don't get a penny. That doesn't make any sense to me at all. Why in the world should the utilities be living in this degree when every bit of it then is absolutely down a rat hole if all of it gets passed through? Well, the commissions would be very unappreciative of their failure to try to protect the consumers' benefits, Your Honor. But an important thing, there's a lot to get through today. I apologize for my shortness. Let me make sure I understood your answer then. For every nickel that they get back in this REP program, every nickel of that goes through? Every nickel goes through to the residential and small farm consumers of the utilities, none to the utilities themselves. Nothing for administrative costs? Nothing. Absolutely nothing. All your attorneys' fees, they come out of the pocket of the investor-owned utilities? That's absolutely right, Your Honor. It all goes to the people. Okay. Absolutely. It's required by the law. There's a section in Section 5C that requires that expressly. And we enforce that through audits, Your Honor. Okay. BPA was facing a serious problem in 1998 because the residential exchange-related contracts were about to expire with the IOUs. We also knew that new contracts would have to be offered because they're mandatory under the law. We also knew the ASC methodology we'd been using to calculate benefits since 1984 was going to have to be revisited because this Court held in 1984 in the Pacific Quarry Refer case, there were significant problems with that methodology. Now, BPA could have said, okay, I'm going to adopt, we're going to adopt all the IOUs' positions. Let's give them billions of dollars in benefits. We could have said, here's the residential exchange program. Let's expose ourselves to billions of dollars of litigation exposure. Or we could have worked with 2,800 parties in the region and tried to come up with a reasonable settlement for their exchange claims. Now, we knew there were going to be exchange claims. There's no question about that. There are three different elements where we have always been, I don't want to say hassled, but aggressively pursued by the investor-owned utilities. The calculation of the benefits themselves, in other words, what the ASCs of the individual utilities are under the average system cost methodology and the methodology itself, the residential exchange contracts that implement the program, and also the PF exchange rate, which is part of the formula and is affected by 7B2. To settle the exchange disputes, you have to address all those elements. And what we did is we went into the record, we looked at BPA's exposure. We knew in the Pacific Core case, we had one issue in that case. The court said, okay, this is return on equity. Okay, BPA, we're going to let you have this now, but it's not a permanent approval of this. And we know that's coming up. That's about $118 million, almost the full cost of the settlement in one issue alone. Now, BPA went through and evaluated its exposure under the 7B2 rate test. In the record, it shows we had $280 million of potential exposure under that rate test. It also shows we had $275 million of exposure under the various issues that implement the exchange program. In pages like five through ten of the Investor-Owned Utilities Brief, they cite over and over the disputes, the claims that we have. We have an appendix in our brief. Dispute after dispute with the Investor-Owned Utilities. To say this wasn't a settlement ignores the basis for what we're doing here. We went into a two-year process of 2,800 people to try to find out what's the right consideration for the settlement. It was never what can we do to set up a program different from the exchange. It's that we're all familiar with the exchange program. We've done these settlements before. What's the right amount of consideration? Now, BPA does have expansive authority, just extraordinary authority, as the Court referenced under Section 2F. It's not completely unlimited. We don't argue that. But it is something that's unprecedented, we believe. In addition to that authority, which is authority both to contract. Why do you think it's so unprecedented? It gives you the authority to enter into contracts and to make settlements. What says that the administrator has the authority to enter into arrangements, agreements, contracts, and to resolve any claims or disputes arising there under such terms and conditions and making such expenditures as he may deem necessary? This is subject to all the other provisions of the Act. Exactly. So he can carry out the Act and its terms by making contracts and settlements. Why is that so unusual? Well, it's not unusual. I think that the expansiveness of the grant of the settlement authority, I think this is limited in one of its opinions. To me, that suggests the Court saw this as something quite unusual and broad. Now, let me ask you this, but it's a follow-on to Judge Reinhart's question. Are you saying that – I mean, I assume we're starting off the top, that if the limitations contained in Section 72B applied, these settlement agreements would be improper. Correct? Would be what, Your Honor? These settlement agreements are improper. If Section 7B2 limitations applied, you're saying we don't have to abide by them because of our power to engage in settlements. Is that right? No, Your Honor. No, Your Honor. What we're saying is, first of all, the Court has to remember, when we came up with the settlement amounts, we already had taken 7B2 into account. Just like with the 29 settlement agreements of the exchange disputes we had with the preference customers in the 80s and 90s, we forecast what the benefits are going to be, and then we take that and reduce it for the effects that 7B2 could have on the amount of those benefits. Well, wait a minute. I don't understand the litigation here, then. You're telling me that you don't need this settlement authority, that you're doing what you're entitled to do under 7B2 in any event? Well, this is a settlement. It's not the exchange program. This is one thing that they're confusing, Your Honor. The settlements don't have to have the elements of the exchange program because Then I maybe didn't ask my question properly. Were this a proper part of the exchange program and you were not invoking your settlement authority, the amount you're paying to the IOUs is too high. Is that right? Absolutely not, Your Honor. And that's why Then I really don't understand the litigation again. And I don't think I just understood your answer. I'm saying, putting to one side settlement, pretending this is the numbers you're now promising to pay, you did not promise to pay under settlement agreements. You simply did as part of the exchange program. Are those numbers too high if they were simply part of the exchange program, irrespective of any settlement? No. Then I don't understand the litigation. Let me explain, Your Honor. At 2001, there was a watershed event. That is, we're going to have a new set of exchange contracts, new terms and conditions, all that are consistent with the Act, new methodology, new disputes. Okay. So we don't know. We didn't know what the exact amount of those benefits would be for the future under that program for the 10-year term. They reference a five-year rate case forecast, not the 10-year term of the settlement agreements. And we recognize, like I said at the outset, if we adopted the IOU positions, which we very well may, and we have a rate case now where we only have an initial proposal, not a final decision, if we adopt those decisions, they get over $300 million a year under the program, Your Honor. So this is within. In fact, this is a very reasonable amount of the settlement. This is important to understand. There's no windfall benefit here or major gift anyone is getting. But I guess I just don't understand, and I've been reading this for days and days and days. I don't understand why you care then about 2F. I mean, first I hear you saying I need 2F because that gives me this extraordinary settlement authority, but then I hear you say, well, we don't need it anyway because even without 2F, we could do this as part of the residential exchange program. Are you saying both things? We tied the amount of the settlement to the forecast of what the exchange benefits could be, and there was a range. There is no one number, Your Honor. I think that's where the confusion is coming from. We can't tell you one number for what the exchange benefits are going to be for that 10-year contract settlement period. When we settled this under our 2F authority, we knew there was uncertainty on both sides. We looked at litigation positions of BPA, the litigation positions of the IOUs, and we had to come to some sort of settlement. Their proposal was basically you can't settle claims under the exchange program, and yet they did it 29 times. No, that's not their position. Their position is you can't settle claims under the exchange program that would result in payments that were higher than were otherwise available under the exchange program. That's their position. And then this one satisfies that because these are within the range that they'd receive under the exchange program, Your Honor. So this is perfectly consistent with that. I see. But you just changed the argument that they made to make it a different one. So you said this is within their REP. Your Honor, when I listened to their oral argument here, I was thinking of their past agreements because they entered into 29 of them. They took a forecast of benefits for the future. They cut it back to reflect 7B2, and they said for the term of this, which was up to 13 years, we don't have to make any 7B2 adjustments to that even if BPA's rate cases have 7B2 triggers all the way through. That's what their agreements did. Now they're saying here, well, ours didn't have to do that, but these do. And we're saying, no, we're doing just what you're doing. We're forecasting the benefits. We're making an adjustment back to reflect 7B2 could reduce those. And we're entering into a reasonable settlement amount. In fact, under the exchange program, from 84 to 2001, the average amount of payments, unadjusted for inflation, by the way, was $125 million a year. In 82 and 83, it was $181 million a year. $140 million was viewed generally as a pretty reasonable amount of benefits to settle the exchange program. You make an argument in your brief that the arguments presented here were not made during the administrative proceeding and, therefore, can't be made here. Is that right? That's the argument? Yes. Was the argument not made at all or merely not made by these parties? Well, that's a good question. It's a complicated one. Well, the question's simple. Let me say that it's a simple question that requires a complicated answer. Okay. Now I've forgotten the question here. The basic question is, was the argument that is now being presented to us made during the administrative proceedings? I'm sorry. Thank you. And it was interesting, Your Honor, because we pointed out that the preference customers didn't make these arguments below and they filed lots of documents to show they had. None of them showed comments submitted in the process to develop these settlements that addressed any of the issues they're raising now. So they aren't relying on their own comments, that's for sure. So they're relying on the DSI comments. The DSIs did not want BPA to have a settlement with power because the DSIs concerned, the industrial customers of BPA, wanted more power to be available so that they could get some. So the DSIs were attacking that power aspect. Now, in their arguments about that, they would say, well, BPA can't just sell power instead of implementing the exchange. But the argument that there was a creation of a substitute program, that, you know, BPA was doing something, we outlined the argument in three points in our brief, Your Honor, I forget our exact summary, but that wasn't raised really. And so there might have been some minor aspects of some of the issues that were raised below, but their basic fundamental arguments were not raised below, Your Honor. Either by themselves or by the DSIs? That's correct. Mr. Goldfarb, you've got your rebuttal question for you right now, then, okay? You can show me where it's raised, by anybody. And I didn't say that there were no things raised by the DSIs. The DSIs did raise a number of issues that they are raising on appeal, but not all the issues that they're raising on appeal. That is what I said, Your Honor. So there are some things that I want to make sure I understand. There are some things that some arguments are being made here that you claim are waived because they were not raised before the agency by any party. Correct. And there are some things here that have been raised by Snohomish and other litigators that were raised but not by them. Correct. As to those, you don't contend that those are waived? No. No, Your Honor. We don't contend those are waived. We believe it was raised by another party. Even if it wasn't them, it's legitimate for appeal. Okay. I want to go back to the Settlement Authority, follow up on the question that Judge Fletcher asked. As you talked about the Administrator's very broad authority and cited to us to the last provision in Section 2F, which says in such manner as he may deem necessary, are you contending that the Settlement Authority is unreviewable? No, Your Honor. So if it's reviewable, it's reviewable under ordinary APA standards, which would suggest then that we can review it either to find out whether it's unconstitutional or outside of statutory authority or arbitrary and capricious. Yes, Your Honor. Okay. So we do have that. So what is your contention then about the Settlement Authority? Just that it's extraordinarily broad, Your Honor. In Section 9B of the Northwest Power Act, Congress recognized we have to operate as a business. Extraordinary broad in what sense? That we can settle any claims or disputes under contracts on terms and conditions. How is that different from other agencies? That the Administrator deems necessary. Well, how is that different from any other agency's Settlement Authority? I have never seen any other agency's Settlement Authority. How do we know it's extraordinarily broad? Well, I've never seen any other statutory provision for an agency's Settlement Authority that was anywhere like that. Have you? Do you know of any others? I don't, and that's because BPA is the Settlement Authority. Then how do we know that it's extraordinarily broad compared with what if we don't know about anybody else? I'm a little puzzled as to what we're trying to get at here. If Congress granted that authority to BPA but didn't grant it to other agencies, that says something. What authority is it that other agencies don't have? Other agencies can settle claims, can't they? Pardon me, Your Honor? Can other agencies settle claims? Yes, absolutely. All right. So what is it about your ability to settle claims that differs from other agencies' ability? Well, we have to operate as a business. We're not like another agency that doesn't operate like a business. We have to recover our costs by law and repay the Treasury for its investment in the Federal system. And this Court, in the AIPAC decision, in decision after decision, has always described this authority itself as broad. That's why I'm a bit confused by this line of questioning, because the Court itself has recognized that this is a broad grant of settlement authority. So let me ask you this. I'm hearing two different arguments from you and one argument from them. The argument I'm hearing from them is that the settlement agreements that you entered into with the IOUs exceed the limits that would apply were you simply doing the residential exchange program and that the settlement authority does not allow you to exceed those limits. I'm hearing you make two arguments. Number one, you're saying, no, the settlement agreements that we entered into do not exceed what we would otherwise be doing under the REP. That's within that range. And then I think you're making a separate argument saying, and even if they did exceed what we could do under the REP, we get to do it. Are you making both of those arguments? No, I'm not making the latter, Your Honor. Oh, so you're saying, well, this is a perfectly sensible then, you know, this is settlement authority because we're doing what the REP would allow us to do in any event. Yes. So that means we have to get deep into this and find out what the REP was going to allow you to do? Well, we've already done it for the Court. We analyzed it. Well, thank you. Yeah. In the record of decision, we go into these things in great detail on many, many issues that were raised during the two-year process and the comment period for the settlements themselves. So we went in and evaluated all those possible issues and put a range on them and made a judgment that within that range, this was the appropriate settlement amount. So you make no argument then that the settlement authority you have under Section 2F allows you to exceed what you would have given and could have permissibly given under the residential exchange program, irrespective of any extraordinary settlement authority? No. We're not arguing that. We believe this amount is well within the range of the benefits they can receive under the program. Absolutely. Oh, well, then you don't need an extraordinarily broad settlement agreement. That sounds like just a pretty straightforward settlement authority. We may not need that broad authority, Your Honor, but it is there. But that does – that argument then does bring you back to whether we would agree with you that the settlement agreements that you entered into are within the scope of what would have been permitted under the residential exchange program without regard or resort to some extraordinary settlement authority. That is to say, you don't need to charge. Settlement authority, Your Honor? Your argument then simply is if we disagree with you and if we hold that these settlement agreements provide altogether too much money that could not be justified under the residential exchange program, you lose. I mean, that's where you're staking your position. Is that right? Well, that is certainly the way the Court could approach it. That's your member. No, I'm asking you. No, I'm asking your position. I'm not trying to put words in your mouth. I'm trying to figure out what your position is. Well, we position – we believe if the Court – if the range we identified for exchange benefits was $10 billion that couldn't have been accomplished under the exchange program, our 2F authority doesn't give us authority to settle for that amount. It has to be an amount within the range of the forecasted benefits for us to settle within. And that's what we did. And, Your Honor, I was trying to make the point that I forgot to save five minutes for Mr. Wood, who is counsel for the Investor-Owned Utilities. I really would like to continue this. There's a lot more I'd like to get into. Unfortunately, I don't have the time. Thank you very much, Your Honors. All right. Mr. Wood, we'll give you five minutes. Thank you, Your Honor. I'm Marcus Wood. I represent Pacificor in this proceeding, but I'm appearing to present on behalf of all the Investor-Owned Utilities who executed the 2000 settlement agreements. And in the five minutes I have, I want to turn directly to what I understand to be the thrust of the questioning that has come up to date, which is what was being settled and why was that within the scope of the statutory residential exchange program. In 2000, there was a watershed event occurring. From the viewpoint of the Investor-Owned Utilities, their residential and small farm customers, who are the beneficiaries of the entire residential exchange, have been shortchanged severely since 1985. Since 1984, actually. And there are two forms of this. And they were shortchanged not because Congress put in a program that was unreasonable and needed to be changed, but because, in our view, BPA had systematically understated the benefits our customers were entitled to under the exchange. With new contracts being raised and with a new rate case, all of the issues were going to be settled or litigated in the year 2000. And it was this event that the 1998 decision of Bonneville addressed. Let me indicate what the two sources of dispute were. Number one, Bonneville has to pay the Investor-Owned Utilities for the benefit of their customers, an amount equal to the average system cost of the Investor-Owned Resources. All of the costs of those resources were included in the program for its first three years. In 1984, Bonneville made the unilateral decision that it would no longer pay for equity or tax costs of generation resources. That was appealed to this court. Bonneville's claim was that very special circumstances at the time justified its decision. Those circumstances, Bonneville claimed, were that one of the Investor-Owned Utilities were using these items to recover the cost of a generation plant that was never completed, which the Act forbids. The court stated that Bonneville had broad discretion in implementation, and the court allowed Bonneville to remove these costs to correct this issue that Bonneville raised. The court also explicitly said that they did not sanction the permanent removal of the costs. We have a new contract coming up. We claim that Bonneville had to put these costs back in under the residential exchange as the statute provided. And if Bonneville either did that or we won that argument on appeal, the value of that argument was over $300 million a year. In addition, Bonneville, in our view, had implemented this 7B2 test in an extraordinarily aggressive manner, in our view, to deprive our customers of benefits. I'll give you just one example that was set out in the record of decision. In all areas except 7B2, conservation is considered a resource, Bonneville considers it a resource like any other resource, except when it runs the 7B2 test. Bonneville has made the discretionary decision that conservation will be excluded as a resource in that test. Bonneville's record of decision laid out what the cost to our customers was of that decision, implementation decision. It was approximately $112 million a year. When added to the $48 million they projected from if they won on every issue we were challenging, you are up to $160 million, which was greater than the estimated value of the exchange. Did Bonneville enter into settlement agreements with IOUs that did not have claims that amounted to the – did not have claims that equaled the amount Bonneville provided under the settlement exchange? All of the IOUs had claims. I understand that. And I'm asking a different question. I'm not sure I formulated it precisely as I wanted to. Were there some IOUs that entered into settlement agreements with Bonneville where the amount provided in the settlement agreement exceeded the amount of litigation claims that those IOUs had against Bonneville? Well, I'm not sure. I doubt it because the litigation claims were substantially more than double the amount of the settlement. But you're talking now aggregate. In the aggregate. I'm talking about specific IOUs. And I don't believe that the record of decision discussed them in the aggregate. Bonneville then, because it needed to – You don't believe it discussed them in the aggregate? No, I said it did discuss them in the aggregate. That's what I thought, yes. And Bonneville needed to reach a settlement that would be acceptable to all the regulators. Does Bonneville have the power to enter into an agreement with a specific IOU in which the settlement amount exceeds the amount of the claims that the IOU had against Bonneville? I believe that Bonneville has the right to enter into an aggregate settlement. And if the parties collectively are entitled to that, if somebody is getting more than they're entitled, somebody's getting less. And if the party getting less challenges, there may be an issue. If none of the parties challenge, I view the non-parties to the settlement as not being affected by whether or not one utility may have gotten a disproportionate share as opposed to another utility. But, of course, the IOU settlement agreements are separate agreements when signed. That is to say it constitutes an obligation between BPA and your client, between BPA and the other client. Those are separate agreements when signed. Right. And you're saying that one of those separate settlement agreements can, in fact, provide greater benefits to the IOU than the IOU had claims against Bonneville. If the result of what I'm saying is that if the settlements collectively are reasonable and the parties I understand what you said, but I want to make sure that what I said is consistent with what you said. I believe in this case it is unless, and this is an important unless, unless the party who could have otherwise had more money, unless one of the parties affected by it, and it's only the parties signing that are affected, Bonneville had to settle with all parties or it couldn't get the claims dismissed. And if all the parties together say we're entitled to claims of $300 million, we'll settle them for $140 million, and we're satisfied with the distribution of the settlement and our regulators are satisfied with the distribution of the settlement, it is the only way Bonneville can settle is to have a settlement that all the parties and their regulators will accept. Let me ask you a separate question, which I asked Mr. Cassad, and that is for every dollar or every nickel that the IOU gets through the residential exchange program, does that entire amount, without any reduction for administrative costs or anything else, get passed on to the customers in rate reduction? Absolutely. Let me tell you briefly how it occurs. Then who pays for your argument that you're making today? Where does that money come from? That money comes from the utility, and whether or not the cost of legal costs or any other costs can be recovered in general rates is a question for the regulators. In other words, it may not get passed on penny for penny. Perhaps I should explain how it is done, and that might help. The regulators set up a special credit account and a balancing account. Every dollar we receive from Bonneville has to be deposited into that account, and every dollar paid out has to be accounted for. There's a balance in that account. The IOUs owe interest on the account. The IOUs set up a credit on every bill, and amounts of those credits are deducted from the balancing account. The credit is specifically for the Bonneville exchange, and we are required for those credits on that account to equal every dollar paid by Bonneville plus any interest on a balance that might be held before it is paid. The question of whether any other costs of the company are included in general rates outside of that credit is a question for the commission. But the commission requires us to account for every penny and to show that it has been paid. Bonneville also audits to make sure that that is true. So I think the answer to my question is your costs, including the lawyer costs of trying to get this money from Bonneville, are put into your cost structure when you go in front of whatever rate-making commission you've got. They may or may not give it back to you in rates. That is correct, Your Honor. Okay. That is correct. In other words, it does not necessarily go penny for penny because you have administrative costs, which may or may not be recoverable depending on what your rate regulator says to you. That is correct. The important point is that we cannot keep any of the money that Bonneville sends to us. Thank you, counsel. Thank you very much. All right. We'll give you five minutes for rebuttal. I'm sure that I have 3 minutes and 11 seconds, and I'll try not to take more than that. I have two brief points that I'd like to make, and then Mr. Goldfarb will come forward and address Judge Fletcher's question with regard to the record. He's gathering that information as we speak. Two points. One goes to the point you were just discussing with Mr. Wood a moment ago, and that is that all of the benefits for the residential exchange that we've been talking about go back to the residential and small farm customers. And you've had your discussion about that, and I don't want to enter into that. But I want to give you the other side of the equation, and that is that money comes from the residential and small farm and commercial and industrial customers that I represent that take their power from the public utilities. And so this is, in essence, a zero-sum game. It's more like the IRS code. The government set the rules on how this money is supposed to be taken from one party and distributed to the other. Those rules are in Section 5C. They're in Section 7B2, and they're in Section 7B3. By this settlement agreement, Bonneville has decided they don't like that rulebook. They've thrown it out. They've written their own rulebook.  That is their argument, Your Honor. We'd contend otherwise. We think that they are not, because we think that the application of the rules done by Bonneville, their determination, they made the judgment. They concluded, based on that, that they could not pay in excess of $48 million. That was the limit placed on their benefits, that they could charge us. So I understood Bonneville's argument today to be that they had a whole range, depending on a series of risk factors, because they were projecting for the future. Yes. That's their argument. And what was that range? What I heard him say was something on the order of $140 to $600 million, if I heard him correctly. Okay. But I understood you to say that the cap was $48 million. Yes, because we're sort of ships crossing in the night. They're talking about their possible exposure under the average system cost methodology under the residential exchange contracts. That's the range he was giving you. That's not the limiting factor. The limiting factor in this particular instance is how much the Section 7B2 rate test permits Bonneville to charge my clients to provide the benefit to Mr. Woods, the residential and small farm customers. So it's not a question of what's the math under the REP. The question is, what's the limit that the statute under 7B2 imposes on Bonneville's charges to us? Because there's – I apologize for interrupting. That's thoughtless. But there's one more part of this puzzle, and that is the reason that is the limiting factor is Bonneville has no other customers to get that money from. I understand that. But does that mean I badly formulated my question both to Mr. Fassad and Mr. Witt when I said, are you contending then that your settlement amount is something you otherwise could have exchanged within the REP, and they were, in their answer, excluding from the definition of REP the 7B2 limitation? Is that what you're telling me? Yeah. It was a difficult question to formulate, and it was also a difficult question to answer. But the conclusion I drew from the answer was that they were not taking into account the limit imposed on their ability to collect those costs from my clients based on the Section 7B2 rate limit. So the $140 to $600 million estimate, that future range, is the calculation under 5C. Exactly, Your Honor. Irrespective of any cap imposed by 7B2. Exactly, Your Honor. And I think, listening to the questions, I think you've gotten the articulation of our point of view on this case very clearly, but I'd like to reinforce that. And that is Mr. Fassad spent much time talking about the length of the process and the reasonableness of the decision and those type of factors. And that's all good. We don't take exception to that. But that's not this case. This case isn't about whether they exercised reasonable judgment in striking an amount of a settlement. This case is about whether or not the language of Section 2F and 9A, subject to other provisions of this statute, requires them to formulate settlements that do not abridge rights that the statute gives to other customers, such as mine. We think that what they did in that contract abridged our rights under Section 5C, 7B2, and 7B3. So this is classically a case of statutory interpretation. It is not a case of judging the reasonableness of their settlement amount. And so I'm going to sit down so Mr. Goldfarb can answer Judge Fletcher's question. Your Honor, I'll limit myself specifically to the Court's question. In the reply brief filed in this case by Snohomish on September 27, 2004, at pages 5 to 7, we list. I'm sorry. Say that slowly. Reply brief. I believe the filing date is September 27 or September 28, 2004. It's the reply brief filed on behalf of Snohomish. Yeah. At pages 5 to 7, we list in bullet points some extracts from the record. I won't read them all to you, Your Honor, but I'll give you just a quick flavor. There were comments filed that said that parties objected to Bonneville's decision to settle the residential exchange in a manner that was contrary to the Northwest Power Act. BPA's settlement authority does not constitute an affirmative grant of authority to create rates in contravention of the Northwest Power Act. Under the guise of settlement, BPA is attempting to offer an alternative benefits package to the IOUs is exactly, precisely the points that are being made in this case. You will find additional information in the brief that was filed by the Public Power Council on the same date, reply briefs both. Okay. Thank you. Thank you, Judge. May I ask Mr. Cassad the question that I might have previously asked inartfully? I asked you the question, or at least I tried to ask you the question, is the amount promised in the settlement agreements within the scope of what you could have thought you were exposed to under the residential exchange program? And your answer was yes. Yes. Now, I now want to make sure I include within my question, when I say within the residential exchange program, including whatever limitations might apply coming out of 7b-2. Yes, Your Honor. All of the settlement amounts that I mentioned, ranging from $48 million to over $300 million, were after taking into account 7b-2. Remember when I asked you. In other words, you and he simply disagree. Yes, Your Honor. Do you have a record site for us on the ROD? I do have one. Can you refer to us as to what pages all of these calculations and demonstrating that it falls both within 5c and 7b-2? There's one chapter in particular in the ROD. There's one that addresses eligibility. That's important, that chapter. The other is the total benefits chapter of the record of decision. Both of those touch on the fact that every single investor-owned utility was eligible to receive exchange benefits and also how we determined the total amount of benefits that was appropriate for them in the settlement. So those two chapters are the key chapters in the ROD. Now, we're looking at the settlement agreement ROD of October 4, 2000. That's correct, Your Honor. There's an eligibility chapter and a total benefits chapter, and that's where that information lies, Your Honor. So you are not arguing that this extraordinary settlement authority you claim the Act gives you allows you in any way to deviate from 7b-2? No, Your Honor. We've satisfied 7b-2. 7b-2 only applies to power rates, and the argument that 7b-2 is somehow disabled is just wrong. BPA could still run 7b-2 in every rate case. Whenever a party like the DSIs lose load or go under, there's less load to allocate a trigger amount to. That's just the way it is. That doesn't disable 7b-2, not at all. All right. Thank you. All right. The case that's here is submitted. We'll now move on to the next. Your Honor, we do have a record site if you'd like. Yes, I would like the record site. The Bonneville Power Administration discussed precisely what the evaluation was of the numbers in its settlement beginning at approximately record AR 0803, and for about the next five pages. And at record AR 0807, Bonneville explicitly evaluated the claims under 7b-2 of the investor on utilities. It was on that page that they evaluated the claim I discussed about exclusion of conservation as being worth approximately $112 million and evaluated the total claims as being worth $280 million a year under 7b-2. Thank you. The case is arguably submitted. We'll move on to the next phase.
judges: Reinhardt, W. Fletcher, Bybee